UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - X

SCOTT YASGOOR, individually and on
behalf of all others similarly situated,

                   Plaintiff,

  -against-

AOL TIME WARNER, INC., AMERICA
ON-LINE, INC., ERIC KELLER, DAVID
COLBURN, ROBERT W. PITTMAN and
MYER BERLOW,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. **04 CV 00920**

**JUDGE BATTS**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff alleges the following, upon information and belief, based upon the
investigation conducted by and through his undersigned attorneys. As to those
paragraphs relating to plaintiff, his purchases of the securities of the publicly
traded company formerly known as Purchase Pro, Inc. ("PPRO") and now known as
Pro-After, Inc. and his suitability to serve as a class representative, plaintiff makes
those allegations of his own personal knowledge. The investigation of plaintiff's
counsel has included, but has not been limited to, the following: (a) the review and
analysis of the filings made by PPRO and defendants with the United States
Securities and Exchange Commission ("SEC"); (b) the review and analysis of the
filings made by PPRO, its employees and others in PPRO's Chapter 11 bankruptcy
proceeding in the United States District Court for the District of Nevada (the "PPRO
Bankruptcy") that are identified in this Complaint; (c) review and analysis of
pleadings and other filings in the consolidated stockholders' actions by



stockholders against AOL Time Warner, Inc.; and (d) review and analysis of pleadings verified by a PPRO officer specifically admitting many of the components of the fraudulent transactions referred to herein.

## I.

### SUMMARY OF CLAIMS

1.     This is a class action brought by Plaintiff on behalf of a class consisting of all persons who purchased the securities of PPRO from March 20, 2000 until May 21, 2001 (the "Class Period").

2.     The defendants include AOL Time Warner, Inc. and America Online, Inc. ("AOL Defendants") and the individuals named herein at ¶¶ 21-24 (the "Individual Defendants") (collectively, the "Defendants") all of whom engaged in a fraudulent scheme throughout the Class Period that was intended to, and had the effect of inflating the market prices of PPRO's publicly traded securities.  PPRO is not named as a defendant in this Complaint because it has filed a bankruptcy petition in the United States District Court for the District of Nevada.

3.     As alleged herein, Defendants engaged in a variety of manipulative and deceptive schemes that served to vastly overstate PPRO's business success, revenues and earnings and facilitate a massive fraud on public investors.  Among other things, the AOL Defendants engaged in phony transactions with PPRO that served to falsely and artificially inflate PPRO's reported sales and earnings.

4.     A July 19, 2002 Washington Post article recounts Defendant Colburn arrogantly describing AOL's deals with PPRO as "science fiction."

5.     As plaintiff alleges in detail herein, throughout the Class Period, AOL and PPRO cultivated a synergistic, but fraudulent, relationship whereby both companies agreed to take steps necessary to create the appearance that they were both producing growing revenues.

6.     As a result, a material portion of PPRO's reported revenues and earnings during the Class Period were fictitious in nature.  The AOL Defendants also issued materially false and misleading statements concerning the business relationship between AOL and PPRO which were intended to advance the fraudulent interests of both companies in hyping the respective stock prices of the AOL Defendants and PPRO.

7.     The true nature of AOL's transactions with PPRO were never disclosed to investors during the Class Period, and investors were never told that the transactions between PPRO and AOL were a sham.  Moreover, defendants never disclosed that these improper transactions were a primary driver of PPRO's seemingly positive growth trend.

8.     The Defendants actively participated in the fraudulent scheme alleged herein.  The defendants were the architects of the structure of the transactions which allowed PPRO to fraudulently inflate its revenues and income and the defendants actively participated in the dissemination of materially false and misleading information to investors.  The AOL Defendants' fraudulent transactions with PPRO were publicly touted by the Defendants and were a principal source of the overstatements of revenue reflected on PPRO's financial statements that had the effect of inflating the trading prices of PPRO's securities.

9.     Following the gradual and belated public revelation of the truth regarding AOL's deals with PPRO, the prices of PPRO's securities collapsed.

10.    Plaintiff asserts the claims alleged herein to recover damages and other appropriate relief on behalf of themselves and the members of the Class.

## II.

### JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa and the principles of pendant jurisdiction.

12.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) and the common law of respondeat superior.

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act because the defendants reside and/or in the case of the AOL Defendants, maintain executive offices in this district.  Furthermore, many of the alleged acts and transactions, and much of the conduct constituting violations of law, including the preparation, issuance, and dissemination to the investing public of materially false and misleading information, occurred, at least in part, in this District.

14.    In connection with the acts alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate

commerce, including the mails, telephone communications, and the facilities of the national securities exchanges.

## III.

## **THE PARTIES**

15.    Plaintiff engaged in the transactions in PPRO securities described in Exhibit A annexed hereto and suffered loss and damage as a result of the violation of law described herein.

16.    PPRO is not named here as a defendant.  It is now bankrupt and known as Pro-After, Inc., a Nevada Corporation and the debtor and debtor-in-possession in a bankruptcy proceeding under Chapter 11 of the United States Code in Case No. BK-S-02-20472-RCJ pending before the United States Bankruptcy Court for the District of Nevada.  PPRO filed its petition in bankruptcy on September 11, 2002.

17.    Defendant AOL Time Warner, Inc. is a Delaware corporation with its headquarters in New York, New York which was formed in connection with the merger of AOL and Time-Warner, Inc. in 2001 (the "Merger").  AOL Time Warner is named herein as a successor in interest to all the liabilities for wrongful acts of AOL prior to the Merger.

18.    Defendant America On-Line, Inc. ("AOL") is a Delaware corporation with its principal place of business in Dulles, Virginia.  Prior to the Merger it was an independent publicly traded company.  Since then, it has been a wholly owned subsidiary of AOL-Time Warner.

5

19.    Defendant Robert W. Pittman ("Pittman") was AOL's President and Chief Operating Officer during the Class Period.  By his own admission, he reviewed and approved the phony transactions between the AOL Defendants and PPRO which are the subject of this lawsuit.  Defendant Pittman made, and/or controlled (1) the fraudulent transactions and manipulations which are the subject of this lawsuit; and (2) the making and issuance of, the public statements described herein issued on or about April 18, 2000, February 1, 2001 and March 28, 2001.

20.    Defendant David Colburn ("Colburn") was senior vice president of business affairs for AOL, who reported directly to defendant Robert W. Pittman.  Following the Merger, Colburn became executive vice president and president of business affairs and development for AOL Time Warner and continued to report directly to Pittman.  Colburn was AOL's and AOL Time Warner's chief dealmaker.  Colburn was terminated from AOL Time Warner in mid-2002 after he was identified as a subject of the SEC and Department of Justice investigations into the AOL-PPRO transactions which are the subject of this suit.  Defendant Colburn controlled the fraudulent transactions and manipulations which are the subject of this suit.

21.    Defendant Eric Keller ("Keller") was a senior executive vice president of Business Affairs at AOL when he reported directly to defendant Colburn.  After the Merger, Keller remained senior executive of business affairs and development and continued to work under, and report directly to, Colburn.  Keller was the number two deal maker at AOL and AOL-Time Warner. He is under investigation by both

the SEC and Department of Justice in connection with the AOL-PPRO transactions which are the subject of this suit.

22.     Defendant Meyer Berlow ("Berlow") was the vice president for national accounts at AOL.  Subsequently, he became president at AOL's worldwide interactive marketing division in the business affairs department.

23.     The Individual Defendants actively participated in the scheme devised to allow both the AOL Defendants and PPRO to inflate their respective stock prices.

24.     Defendant Keller, a Senior Vice President in the Business Affairs Division and purported number two dealmaker to his boss Colburn, participated in the formulation and implementation of AOL's advertising transactions with Homestore and PPRO.  He was identified by The Wall Street Journal as the head of a team involved in the PPRO-AOL transactions.

## IV.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23.  The "Class" consists of all persons and entities who were damaged as a result of their purchases of PPRO securities on the open market during the Class Period.  The following persons are excluded from the Class: Defendants; the officers and directors of PPRO and the AOL Defendants; members of those persons' immediate families; those persons' legal representatives, heirs, successors and assigns; and any entity in which any Defendant has or had a controlling interest.

26.     The Class is so numerous that joinder of all Class members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained from the records maintained by PPRO or its agents, as of November 9, 2000, there were over 66 million shares of PPRO common stock outstanding.  Those shares were held by thousands of shareholders located throughout the world.

27.     Plaintiff's claims are typical of the claims of the members of the Class because all members of the Class purchased PPRO securities during the Class Period and sustained damages as a result of the same misconduct, as alleged herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel competent and experienced in class action and securities litigation and Plaintiff has no interests antagonistic to or in conflict with the other members of the Class.  Furthermore, Plaintiff has suffered substantial economic losses as a result of Defendants' misconduct and, therefore, has significant incentive to prosecute this action diligently.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because there are many Class members and those persons are located throughout the world, joinder of all Class members is impracticable.  Moreover, individual Class members are foreclosed from prosecuting separate claims because the damages suffered by most Class members are far smaller than the expenses associated with individual actions.  Thus, it is desirable for all concerned to conduct this litigation on behalf of all Class members

in a single forum.  No unusual difficulties are likely to be encountered in the management of this class action.

30.   There are numerous questions of law and fact common to the members of the Class that predominate over any questions affecting only individual Class members.  These common questions of law and fact include, among others:

(a)   whether Defendants violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5;

(b)   whether Defendants participated in the common course of conduct complained of herein;

(c)   whether documents, releases, reports, and statements disseminated to the investing public during the Class Period failed to disclose or misrepresented material facts concerning the Company's financial condition and operations;

(d)   whether Defendants acted with knowledge or with reckless disregard for the truth in omitting and/or misrepresenting material facts concerning the Company's revenues, net income, operations, financial status and prospects;

(e)   whether, during the Class Period, the market prices of PPRO securities were artificially inflated due to the non-disclosures and/or material misrepresentations complained of herein; and

(f)   whether the members of the Class have sustained damages, and, if so, the proper measure thereof.

## V.

## DEFENDANTS' PARTICIPATION AND
## MOTIVE TO PARTICIPATE IN THE FRAUDULENT SCHEME

### A.    The Defendants Had Substantial Motives To
### Commit The Fraudulent Acts Alleged Herein

31.    The Defendants possessed substantial motives for engaging in the fraudulent scheme alleged herein.  The Individual Defendants conceived of and executed the phony transactions herein to allow both AOL and PPRO to inflate reported revenues and income and to inflate the price of AOL and PPRO securities.

32.    The defendants had a specific motive to inflate the price of PPRO Securities because AOL received PPRO securities as part of the phony transactions.  With any subsequent rise in the price of PPRO securities, AOL improperly booked that gain as "advertising" and/or "e commerce" revenue and thus was able to deceive its own investors and ensure the stockholders approval of the Merger.  As described below, the reporting of ever-increasing advertising and e-commerce revenue was essential to (1) driving up AOL's stock price and (2) completion of the Merger.

33.    Since its inception as a public company, AOL's stock price has been derivative of its revenues rather than its earnings or cash flow.  As a result, there has been a financial incentive for AOL to emphasize its revenues in its reports to the public investor world.  Stock market analysts, taken in by defendants' hype, were valuing the AOL stock based on multiples of the advertising and e-commerce section of AOL's business.  Indeed, one analyst valued AOL at between 44 and 171

times its reported estimated advertising and e-commerce revenue for 2000, which was far greater than the multiple ascribed to other parts of AOL's business.

34.    AOL's Form 10-K for the annual period ended June 30, 1997 described the importance of advertising revenue from "relationships" with e-commerce partners to AOL's success:

> An important component of the company's business strategy is to increase non subscription based revenues, including advertising sales and transaction fees associated with electronic commerce and the sale of merchandise which the company believes are increasingly important o its growth and success.  The company continues to establish a wide variety of relationships with advertising and electronic commerce partners in order to grow its non-subscription based revenues and to provide AOL subscribers with access to a broad selection of competitively priced, easy to order products and services.

35.    According to a former AOL Chief Technology Officer, product manager and senior business manger, AOL insisted that some of its advertisers and content providers give AOL performance warrants or shares of their companies for as little as a penny a share. According to this source, "internally the thinking at AOL was that when we sign a deal with a company, the stock will go up so we would try to capture the full value of our deal."

36.    On or about January 10, 2000, AOL and Time Warner announced their agreement to merge in a deal valued at over $200 billion dollars based upon the combined equity values of the companies at the time.

37.    The merger was not greeted warmly by Time Warner's shareholders as a whole who believed that, in the aggregate, the Time Warner shareholders would

not receive their fair share of the equity of the combined companies given the exchange ratio in the merger agreement.

38.    The closing of the merger was subject to many conditions.  One of the main conditions, however, was the approval of the merger and its terms by a majority of the shareholders of Time Warner.

39.    Thus, AOL executives correctly believed that the there would be no chance for approval of the merger by Time Warner shareholders if AOL's estimated reported growth in e-commerce and advertising revenues were not realizable.

40.    Internal documents within AOL at the time, however, indicated that in 2001 alone AOL was at risk of losing at least $140 million in advertising revenue.

41.    Defendants understood that the consummation of the Merger was vital to the viability of AOL which needed to diversify its revenue base away from exposure to a clearly deteriorating environment for e-commerce and internet advertising revenue business models.

42.    The Merger was scheduled to close in or about January 2001.

43.    To prevent the Merger from unraveling, the defendants continued their scheme to inflate the advertising and e-commerce revenues reported by AOL.  The AOL-PPRO scheme was only one of many phony deals with other companies, such as PPRO, which were hyped to investors.  The scheme involved phony transactions and business deals with at least 12 high tech companies including PPRO.

**B.    Defendants' Participation**

44.    As is alleged in detail herein, defendants directly and actively participated with PPRO in a fraudulent scheme to falsely inflate PPRO's financial

results by engaging in material transactions with PPRO that lacked economic substance, but enabled both PPRO and AOL to report inflated revenues.

45.     According to a former AOL Vice President for business development, AOL had an "Operating Committee" or "Op Com", consisting of nine top members of senior management chaired by Pittman, which held weekly meetings to discuss matters of importance to AOL including transactions such as the AOL-PPRO deals, the restructuring of advertising deals for AOL-PPRO and the downturn in AOL's advertising business.  Members of the Operating Committee during 2000-2001 (the Class Period described herein) included, among others, Defendants Pittman, Colburn and Berlow.

46.     According to The Washington Post, David M. Colburn, who ran the Business Affairs division, reported to Pittman.  In addition, Colburn is reported to have been particularly close to Pittman.  Colburn reviewed and approved all of the PPRO transactions described in this Complaint.  A former account manager in the account services unit of AOL's Interactive Marketing division stated that for big advertising deals, Berlow or Pittman also signed off.  According to the former employee, the bigger the deal the more significant the list of people signing off on the deal.  In an Advertising Age article dated May 7, 2001, Pittman noted, with regard to cross-media advertising deals: "We generally do these issues at the COO or CEO level within the Company."

47.     A former AOL senior executive in the October 30, 2000 Industry Standard article entitled, "AOL's Rough Riders" stated "Colburn is the driver when it comes to deals at AOL ... He oversees all of the dealmaking the Company does."

48.     As was further reported in the <u>Industry Standard</u> article:

> Never was Colburn more valuable to AOL than when the
> portal deal was born, the offspring of necessity and
> opportunity.  In December 1996, AOL, following the lead of
> its competitors, dropped its pay-by-the-hour method of
> charging customers in favor of a flat monthly fee ....
>
> Deals with the company's many content providers, which
> had been based on AOL's per hour fees needed to be
> renegotiated and alternative revenues had to be found.
> Back then there was plenty of talk about a wondrous new
> business model dubbed the portal but how a company
> might cash in on all those eyeballs they had attracted
> remained to be seen.  That's what David was responsible
> for doing says a former Colburn lieutenant.
>
> It largely fell on him to restructure all the existing deals
> and figure out more importantly how the company could
> make money as a portal.  The plan for dealing with
> content was a radical departure from the old model; most
> would now have to pay for the privilege of providing news
> and information to AOL users.  Its not like an edict was
> handed down one Thursday and that was that, says David
> Ellington, CEO of Net Noir, an AOL stalwart since 1995.
> But on the other hand, it's not like they left us much room
> to negotiate".  Yet finessing relations with a few pissed off
> content providers was hardly AOL's main concern.
>
> Terms such as anchor tenancy had been invented or
> reinvented for the web, and a new paradigm adopted: AOL
> was no longer a diverse community of users but an
> enormous online shopping mall visited by tens of millions
> of consumers.

49.     As a result of the fraudulent PPRO-AOL transactions specifically

described herein, PPRO materially overstated its revenues during the Class Period

and AOL improperly recognized millions of dollars of revenue from the PPRO-AOL

transactions during the Class Period.  In this way, both AOL and PPRO benefitted

from these fraudulent transactions because both companies were able to report the

kind of substantial revenue growth that they had promised investors they could expect.

**C. The Defendants Had Access To And Knowledge Of, Material Adverse Information Which Contradicted Public Statements And/Or Rendered Same Materially Misleading By Omission**

50.     The conclusion that the defendants herein acted with scienter is also supported by their substantial motives and the fact that the individual defendants were direct participants in the phony revenue-inflating transactions which are the subject of this action and further supported by the fact that public statements made by the defendants concerning the AOL-PPRO transactions were contrary to true facts known by the individual defendants.

51.     Due to the critical importance of advertising revenue to AOL, this revenue source was tracked closely by the AOL Defendants and their top executives, including some or all of the individual defendants named herein. According to a former AOL Vice President, reports prepared by Robert O'Connor, Vice President of Finance for the Business Affairs Unit, both before and after the Merger, showed every advertising deal that AOL had and the amount of annual revenue recognition expected from each deal. These reports indicated the amount of revenue initially expected on a deal and the revised lower amount of anticipated revenue if that advertiser was experiencing financial difficulty. Additionally, AOL utilized a periodic "pipeline report" prepared by the Interactive Services unit, which report described advertising deals in the pipeline and anticipated to generate revenue. The Individual Defendants had access to such reports. Also, weekly business meetings were attended by "Colburn's people" including, among others,

15

Colburn and defendant Keller.  During these meetings various advertising deals, including the significant financial problems of existing customers that jeopardized continuing revenue from those contracts, were discussed.

52.    AOL furthered the fraudulent scheme in which it participated with PPRO by making materially false representations concerning its relationship with PPRO long after that relationship was demonstrating the serious problems described in detail below.

## VI.

## THE SCHEME

53.    In 1999, PPRO became a publicly traded company.  It represented itself, as of the beginning of the Class Period, as one of the largest B2B e-commerce software companies in the world offering "solutions" to help businesses buy, sell and collaborate.

54.    PPRO's business plan involved the development of strategic relationships with large prominent companies such as AOL and thereafter hyping these relationships to the investing public to cause PPRO's stock price to rise. Similarly, the AOL Defendants were committed to the same goals: reporting ever-higher revenues and maintaining the AOL stock price at artificially inflated levels.

55.    A PPRO executive officer, Jeffrey R. Anderson, has admitted in a Statement of Facts dated September 23, 2003 in USA v. Jeffrey R. Anderson (E.D. Va. Alexandria Division) that representatives of AOL and PPRO conspired to falsely inflate each other's revenues through the concoction of the various business agreements and transactions referred to herein.

16

56.    In early March 2000, PPRO developed its business relationships with AOL.  AOL and PPRO entered into a series of agreements on March 15, 2000 which were promptly and prominently reported to the investing public causing a rise in the price of the stock of PPRO.

57.    Among those contractual agreements were: (1) an interactive marketing agreement, (2) a technology development agreement, and (3) a warrant agreement.

58.    Pursuant to the agreements, PPRO was required to pay AOL $50 million in cash to allow PPRO to be AOL's strategic partner and co-develop with PPRO a business to business global marketplace on AOL's internet platform. PPRO was also required to pay to AOL, a total of $20 million to reimburse AOL for the development costs associated with bundling AOL's internet platform.

59.    Also, pursuant to the foregoing agreements, PPRO gave AOL stock warrants and/or cash.  These warrants were periodically repriced by PPRO to allow AOL to book as revenues from advertising and e-commerce the amounts by which the value of the PPRO securities rose.

60.    On April 18, 2000, the AOL Individual Defendants caused AOL to issue a press release wherein PPRO was specifically identified and which announced "record" financial results for AOL for the quarter ended March 31, 2000, and boasting about advertising deals:

> America Online, Inc. (NYSE: AOL) today announced record
> results for the third quarter of fiscal 2000, ended March
> 31, 2000 – <u>reaching new highs for consolidated revenues,
> advertising and commerce revenues, operating income,</u>
> and EBITDA.

Third quarter revenues rose to $1.8 billion or 47% over last year's March quarter.  <u>Advertising, commerce and other revenues climbed 103% over fiscal 1999's third quarter to $557 million – marking a record $120 million increase or 27% over this year's second quarter</u>.

\*\*\*

Bob Pittman, President and Chief Operating Officer, said: "This quarter is an excellent example of how America Online is uniquely positioned in the Internet industry.  We have built an unmatched collective of interactive brands, which will be further enhanced by the Time Warner merger, and we have unparalleled connection to consumers.  <u>We're taking online advertising and commerce to new heights, yet we've barely scratched the surface in terms of the impact our medium can have</u>."

\*\*\*

Key operating metrics from the quarter included:

\*\*\*

Backlog: <u>The Company brought its consolidated backlog of advertising and commerce revenue to more than $2.7 billion at the end of the quarter, up from $2.4 billion on December 31, 1999</u>.

\*\*\*

Working closely together in anticipation of their merger, <u>America Online and Time Warner this quarter launched a number of cross-promotional agreements</u> involving their world-class brands.

\*\*\*

Extending its <u>advertising and commerce leadership</u>, the Company announced a series of significant <u>advertising/commerce alliances this quarter</u> with such market leaders as General Motors, American Airlines, Sears, Kinko's, Footlocker.com, Oxygen Media and PurchasePro.com.

(Emphasis added).

61.    AOL made several highly publicized bulk purchases of subscriptions for PPRO software licenses but AOL had failed and indeed had no intention of

making bona fide efforts to sell the subscriptions to end users.  However, the publicity surrounding the AOL and PPRO relationship and transactions served defendants ' purpose by making it appear to the investing public that there was demand for PPRO's products and services which in turn inflated PPRO's stock price and thus allowed AOL to report ever increasing revenues from advertising and e-commerce because AOL improperly booked the value created by the rise in price of the PPRO securities owned by AOL.

62.     In the fourth quarter of 2000 alone, AOL booked $30 million in revenue from warrants provided by PPRO to AOL in exchange for $10 million in referral revenue from AOL.  AOL's strategy was to tout the AOL-PPRO relationship and profit from an increase in the value of PPRO warrants, the increase in value of PPRO warrants was then improperly recorded by AOL as revenues from advertising and e-commerce.    This allowed AOL to reach its quarterly revenue and growth projections during the Class Period.

63.     It was agreed between AOL and PPRO that in exchange for the revenue enhancing deals beneficial to AOL, AOL would "purchase" PPRO's software licenses for resale to AOL customers.  The public announcement of this transaction made it appear to the public that there was a strong demand for PPRO's products and services.  The licenses "purchased" by AOL from PPRO for resale were purchased at a commercially unreasonable 50% discount.  The normal and reasonable discount was 10-20% and therefore the 50% discount reflects the fact that the transaction was not bona fide and was done only to allow AOL to recognize revenue.

64.    PPRO improperly recognized revenue from these transactions in its quarterly and annual financial statements released to the public and filed with the SEC during the Class Period.

65.    On or about November 18, 2000, AOL and PPRO entered into an agreement to allow AOL to "earn" PPRO warrants.  The agreement included a formula which allowed AOL to be credited with 3 dollars in revenue for each single dollar of revenue recognized by PPRO from its relationship with AOL.

66.    As a quid pro quo, PPRO gave AOL credit for PPRO direct transactions not obtained through AOL so that AOL could recognize warrant revenue from PPRO as advertising and e-commerce revenue.

67.    Upon information and belief, PPRO improperly accounted for the AOL-PPRO transactions to inflate PPRO's financial results set forth in the 10-K filed for the year ended December 31, 2000 by engaging in accounting tricks and improprieties, including recognizing revenues on "sales" to customers to whom PPRO had granted large amounts of warrants to acquire PPRO stock and by engaging in induced transactions.  PPRO reported the following financial results during 2000:

|  | Q100 | Q200 | Q300 | Q400 |
|---|---|---|---|---|
| Revenues | $4.5 million | $9.5 million | $17.3 million | $33.6 million |
| Net Loss | $8.3 million | $7.1 million | $4.7 million | $36.7 million |
| Loss Per Share | $0.14 | $0.11 | $0.07 | $0.55 |

68.    On December 28 and 29, 2000, PPRO CEO Johnson, being interviewed by CNBC and CNN respectively on successive days, touted the PPRO-AOL relationship.

20

69.    On February 1, 2001, The Los Angeles Times reported that AOL Time Warner again told investors they shouldn't worry about the newly merged company meeting its financial targets because advertising revenue growth at AOL would continue to boost the Company's total revenues, despite the slowing advertising market:

> AOL Time Warner tried to reassure Wall Street on Wednesday that the newly merged company – fueled largely by its fast-growing America Online unit – remains on track to meet its financial targets, despite a slowing economy and softening advertising market.

The article continued:

> To help calm investor worries about the advertising slowdown, the company noted that it was already reaping the benefits of its larger size.  It announced marketing deals with Nortel Network Corp., Cendant Corp., Compaq Computer Corp. and PurchasePro, a business-to-business e-commerce company.

(Emphasis added).

70.    In fact, AOL's advertising and commerce revenue reported in its financial statements of $686 million for the quarter ended December 31, 2000, was overstated by at least $186.8 million, an overstatement of the actual advertising and commerce revenue by at least 37% as a result of AOL's accounting for its phony transactions with PPRO in the amount of $25.4 million.

71.    The overstatement was part of a quarterly overstatement as a result of sham deals with e-commerce partners including PPRO which included improper recognition of income as follows: for the calendar year ended December 31, 2000 by at least $678.1 million, due to AOL's improper accounting for the Sun ($50.4 million), eBay ($67.2 million), Homestore ($17.6 million), Hughes ($180 million),

Gateway ($340 million), 24dogs.com ($23.7 million), Veritas ($4 million), Telefonica SA ($10 million), WorldCom ($12.7 million), Monster.com ($25 million), PurchasePro ($25.4 million), Ticketmaster ($13 million) and Dr. Koop.com ($9.6 million) deals.

72.    In early 2001, in connection with the imminent reporting by both AOL and PPRO of their respective first quarter of 2001 financial results, PPRO's CEO Johnson traveled to New York to meet with AOL executives to discuss how revenue was going to be recognized by both companies from the PPRO-AOL transactions described above.

73.    It has been admitted by PPRO executive Anderson that he discussed with an executive of AOL that if PPRO agreed to falsely credit AOL with referrals for marketplace licenses in the fourth quarter of 2000 and thereby allow AOL to "earn" about thirty million dollars of warrants from PPRO, then AOL would reward PPRO with deals designed to allow PPRO to recognize revenue in future quarters.

74.    Thus, Anderson and AOL agreed that AOL would be falsely credited with referrals of third parties to PPRO that had purchased licenses from PPRO in the fourth quarter of 2000 so that there would then appear to be a basis pursuant to the amended warrant agreement for AOL to earn approximately $30 million dollars on PPRO warrants.  Thereafter, as was agreed between PPRO and AOL, PPRO falsely reported that the relationship between PPRO and AOL had generated 10 million in licenses for PPRO when in fact both PPRO and AOL knew that the true amount was less than half of that.

22

75.     In or about January 2001, according to PPRO former executive officer Anderson, PPRO and AOL developed a joint sales and marketing effort whereby AOL would help PPRO sell PPRO products to AOL partners and suppliers.  In order to "sell" the PPRO products, AOL in effect guaranteed to the purchasers of the PPRO licensees that they would receive discounts from or purchases by AOL in amounts equivalent to or in excess of the license purchases.

76.     On February 22, 2001, PPRO executives held a conference call with securities analysts to discuss PPRO's fourth quarter 2000 results and PPRO's business and prospects.  During the meeting and in follow-up thereafter, PPRO executives Johnson and McGhee and others continued to make misrepresentations regarding AOL's warrant earnings and projected revenues for fiscal year 2001.

77.     In March 2001, the defendants supplied PPRO with a falsified "statement of work" as a means of helping PPRO recognize revenues to allow PPRO to meet its previously stated earnings and revenue projections.

78.     On March 28, 2001, PPRO and AOL issued a joint press release transmitted simultaneously from PPRO's offices and AOL's offices announcing to the public the alleged success of PPRO and AOL's joint sales and marketing efforts in the first quarter of 2001.  According to the joint press release, the joint sales and marketing efforts resulted in the sale of ten PPRO licenses to other companies. The joint press release was intended to by AOL and PPRO, and did, create the false and misleading impression that AOL and PPRO had a thriving legitimate joint sales and marketing effort which was bearing fruit for PPRO.

23

79.    On the last day of the quarter ended March 31, 2001, PPRO drew blank checks payable to AOL. These checks were sent on behalf of PPRO by Miller. A check in the amount of $12.2 million was made out to AOL and AOL booked the same as commission revenues despite the fact that AOL knew that PPRO would only be booking a small portion of that amount as commissions.

80.    In fact, AOL Time Warner's reported AOL segment advertising and commerce revenue for the quarter ended March 31, 2001 of $721 million was overstated as a result of the inclusion of approximately $7 million in improperly recognized revenue from phony deals with PPRO. Based on the restatement of AOL's financial results in its SEC Form 8-K filed on October 23, 2002, AOL has already admitted overstating AOL advertising and commerce revenue for the quarter ended March 31, 2001.

81.    Thereafter, on or about April 9, 2001, AOL and PPRO, through their respective executive level officers involved in the scheme, agreed that PPRO could create a document reflecting AOL's purported agreement in February 2001 for AOL to purchase services from PPRO. Upon PPRO's request, AOL furnished an acceptance of the services supposedly provided by PPRO.

82.    On April 26, 2001, PPRO issued a press release in connection with the reporting of its first quarter 2001 financial results. The press release reported upon, among other things, the "enhanced development of the company's relationship with AOL." PPRO represented that nearly two-thirds of its revenue during the first quarter of 2001 came through its partnership with AOL.

24

83.    After delaying the scheduled April 25, 2001 release of its financial results for the first quarter 2001, on April 26, 2001, Clough and Johnson, acting on behalf of PPRO, issued a press release entitled, "PurchasePro Reports First Quarter Results."  This press release reported first quarter 2001 results, which Defendants knew or should have known were false and misleading, particularly with regard to the purported "enhanced development of the company's relationship with AOL."  PPRO misrepresented that nearly two-thirds of its revenue during the first quarter of 2001 came through its partnership with AOL.  In fact, AOL had not come through with its promised referral revenue, as discussed above.

84.    On June 20, 2001, The Wall Street Journal reported that concerns about online advertising deals made with PurchasePro led AOL Time Warner to investigate, but at that time AOL stated that it had accounted properly for all revenue related to PurchasePro:

> America Online suspended top deal maker Eric Keller as part of an investigation into the company's involvement with PurchasePro.com, Inc.  Mr. Keller is a senior vice president for business affairs at America Online, a unit of New York's AOL Time Warner, Inc.  He runs a team of negotiators who hammer out deals such as the one with PurchasePro, a start-up business-to-business software firm that this past year agreed to pay America Online $50 million for a marketing agreement and $20 million for a software agreement.  America Online owns 5.7% of PurchasePro, Las Vegas, and is entitled to a cut of PurchasePro's software revenue ...

(Emphasis added).

85.    By June 2001, the illicit relationship between AOL and PPRO had resulted in AOL receiving from PPRO $127 million dollars in securities and cash.

PPRO, however, had received only $43 million dollars in value of goods and services and subscription sales from AOL.

86.    In fact, AOL Time Warner's reported AOL segment advertising and commerce revenue for the quarter ended June 30, 2001 was overstated as a result of the inclusion of approximately $9 million in improperly recognized revenue from phony deals with PPRO.  AOL has already admitted that its advertising and commerce revenue was overstated based on its restatement of the quarter's results in the SEC Form 8-K filed October 23, 2002.

87.    The AOL Defendants later acknowledged the corrupt nature of their transactions by restating AOL's reported quarterly financial results for every quarterly and annual period from July 1, 2000 to June 30, 2002.  Not coincidentally, the largest quarterly restatement of AOL's advertising revenues, a reduction of $66 million, was for the last publicly reported fiscal quarter prior to the consummation of the merger.  It was in that quarter when the sham transaction between PPRO and AOL reached its apex and the additional revenue wrongfully recognized by AOL as a result of the sham transaction constituted $27 million of the $66 million recognized by AOL in that critical quarter.

88.    On February 5, 2003, The Wall Street Journal reported:

> In an indication that federal authorities are expanding their criminal investigation of AOL Time Warner Inc.'s America Online unit, the Federal Bureau of Investigation has sought to question several former PurchasePro.com Inc. officers in the past few weeks.

> ... People familiar with the situation said the Department of Justice and the Securities and Exchange Commission are focusing on America Online and some of its former executives, including Eric Keller and David M. Colburn.

These people said the investigation, which was launched last summer, is continuing and prosecutors are expected to decide whether to bring charges later this year. Simultaneously, federal prosecutors in Los Angeles are probing America Online's relationship with Homestore.Inc. Several former Homestore officials have pleaded guilty to fraud and are cooperating with prosecutors.

AOL declined to comment.

(Emphasis added).

## VII.

### DEFENDANTS' MATERIALLY FALSE REPRESENTATIONS AND OMISSIONS AND FRAUDULENT COURSE OF CONDUCT WERE THE CAUSE OF THE DAMAGES SUFFERED BY PLAINTIFF AND THE CLASS

89.    As described herein, Defendants made or caused to be made a series of false statements and failed to disclose various material information concerning PPRO and engaged in the transactions described herein to manipulate the price of PPRO securities. Throughout the Class Period, Defendants' material misrepresentations and omissions and manipulative acts in furtherance of the scheme to defraud described herein had the effect of inflating the price of PPRO securities and maintaining the prices of PPRO securities at levels those securities would not have traded had the truth concerning the Company's operations been disclosed to investors. This conduct resulted in plaintiff and other members of the Class purchasing PPRO securities at prices significantly in excess of the actual value of those securities.

90.    Plaintiff, and other members of the Class, either would not have purchased PPRO securities or would not have purchased such securities at the

prices that prevailed during the Class Period, had there been truthful information about the AOL-PPRO transactions made available.

91.    When the market determined the truth of the transactions and relationship between AOL and PPRO, the prices of PPRO's securities declined substantially in value.  The securities held by the members of the Class are now completely worthless.

92.    Accordingly, the material misrepresentations, omissions, acts, practices and schemes alleged herein were the proximate causes of the damages and loss sustained by Class members in connection with their purchase of the Company's securities during the Class Period.

## NO SAFE HARBOR

93.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the misrepresentations or omissions alleged herein.

94.    Defendants did not adequately identify any of the misrepresentations alleged herein as "forward-looking statements" at the time those representations were made.

95.    Furthermore, those representations were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.

96.    To the extent that the statutory safe harbor could apply to any of the misrepresentations pleaded herein, those statements are actionable because, at the time those representations were made, the speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of AOL or AOL Time Warner who knew that the statement was false or misleading.

## COUNT I

### (VIOLATIONS OF §10(b) OF THE EXCHANGE ACT AGAINST DEFENDANTS)

97.     Plaintiff repeats and realleages the foregoing allegations as if fully set forth herein.

98.     During the Class Period, each defendant, individually, and in concert with the other Defendants, engaged in a plan, scheme and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon plaintiff and other members of the Class.  The purpose of the fraudulent scheme in which Defendants participated was to enable AOL and PPRO to falsely inflate its financial results throughout the Class Period.

99.     In part, Defendants perpetrated this fraudulent scheme by making representations that were false and by failing to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.  Defendants were obligated to supplement and update the disclosures that they made during the Class Period because they voluntarily made materially misleading statements regarding PPRO's operations and the status of PPRO's relationship with AOL.

100.  Defendants had actual knowledge that the statements specifically alleged above were materially false and misleading and that additional disclosures

were necessary to correct the misleading effect of their statements and of the fraudulent scheme to falsely inflate PPRO's revenues during the Class Period. In the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain that their statements concerning PPRO's business and operations lacked a reasonable basis when made and failed or refused to ascertain the existence of the fraudulent scheme alleged by plaintiff.

101.   As a direct and proximate result of the foregoing material misrepresentations and omissions and the fraudulent scheme in which Defendants participated, the market prices of PPRO securities were artificially inflated throughout the Class Period.

102.   In ignorance of the materially misleading and/or incomplete nature of the Class Period representations made by Defendants and Defendants' participation in the fraudulent scheme alleged herein, Plaintiff and other members of the Class relied to their detriment upon the accuracy and completeness of Defendants' statements and/or upon the integrity and efficiency of the market for PPRO securities.

103.   Plaintiff and the other members of the Class would not have purchased PPRO at the market prices that prevailed during the Class Period, if at all, had they been aware of the true facts concerning PPRO's operations and future prospects or Defendants' participation in a fraudulent scheme to inflate PPRO's reported revenue.

104.   The market price of PPRO's securities declined as investors belatedly learned the adverse facts that had been concealed and misrepresented by

Defendants during the Class Period. Plaintiff and other members of the Class has therefore suffered substantial damages as a direct and proximate result of the misconduct committed by Defendants.

105. By reason of the foregoing, Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made material misrepresentations of fact and failed to disclose material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of PPRO securities during the Class Period.

## COUNT II

### (VIOLATIONS OF §20(a) OF THE EXCHANGE ACT AGAINST DEFENDANT PITTMAN AND COLBURN)

106. Plaintiff repeats and realleges each and every allegation contained above.

107. Defendants Pittman and Coburn, acted as controlling persons of AOL within the meaning of Section 20(a) of the Exchange Act. By reason of his senior executive and/or Board positions, Pittman had the power and authority to cause AOL to engage in the wrongful conduct complained of herein. Defendant Colburn was in charge of the implementation of the phony transactions described herein. By reason of such wrongful conduct and positions of control and the exercise thereof, defendants Colburn and Pittman are liable pursuant to §20(a) of the

Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of PPRO stock during the Class Period.

### COUNT III

### AGAINST AMERICA ONLINE, INC. AND AOL TIME WARNER, INC. FOR RESPONDEAT SUPERIOR LIABILITY

108.  Plaintiff repeats and realleages the foregoing allegations as if fully set forth herein.

109.  At all relevant times the individual defendants named herein were employees of the corporate defendants named herein who are the subject of this cause of action.

110.  The acts and conduct of the individual defendants as alleged herein constituting violations of Section 10(b) of the Exchange Act and Rule 10b-5 and 20(a) were within the course and scope of employment of the individual defendants.

111.  The acts and conduct of the individual defendants as alleged herein constituting violations of Section 10(b) and 20(a) of the Exchange Act did not constitute any deviation from the individual defendants' service to their employers, the corporate defendants named in this Count.

112.  As a result of the foregoing, the defendants named in this Count are liable for damages arising out of the violations of laws committed by the Individual Defendants.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

1.      Determining that this action is a proper class action and certifying

plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

2.  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.  Such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated:    February 2, 2004

SQUITIERI & FEARON, LLP

By: _____
       Lee Squitieri (LS-1684)
420 Fifth Avenue
18th Floor
New York, New York 10018
Tel: (212) 575-2092

THE WEXLER FIRM
Kenneth A. Wexler
One North LaSalle Street
Chicago, Illinois  60602
Tel: (312) 346-2222

Attorneys for Plaintiff



## PLAINTIFF'S SWORN CERTIFICATION

I, Scott Yasgoor, under penalty of perjury, certify that:

1.    I have reviewed the complaint and authorized its filing.

2.    I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in the security that is the subject of this litigation during the class period set forth in the complaint a purchase of 1030 shares of Purchase Pro common stock  in November 2000.

5.    I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.



Scott Yasgoor